IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

JOHN MAELLARO,                              :
                                            :
          Plaintiff                         :
                                            :
     v.                                     :          3:12-CV-01560
                                            :
CAROLYN W. COLVIN, ACTING                   :          (JUDGE MARIANI)
COMMISSIONER OF SOCIAL                      :
SECURITY,                                   :
                                            :                    **FILED**
          Defendant                         :                    **SCRANTON**

                                                                 JUN **1 8** 2014

                        **MEMORANDUM**
                                                      PER_____
                                                           DEPUTY CLERK

**Introduction**

     Plaintiff John Maellaro has filed this action seeking review of a decision of the

Commissioner of Social Security ("Commissioner") denying Maellaro's claim for social

security disability insurance benefits and supplemental security income benefits.

     Disability insurance benefits are paid to an individual if that individual is disabled and

"insured," that is, the individual has worked long enough and paid social security taxes. The

last date that a claimant meets the requirements of being insured is commonly referred to

as the "date last insured." It is undisputed that Maellaro met the insured status

requirements of the Social Security Act through December 31, 2007. Tr. 282. In order to

establish entitlement to disability insurance benefits Maellaro was required to establish that

he suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Maellaro protectively filed his applications for supplemental security income benefits and for disability insurance benefits on February 23, 2007, claiming that he became disabled on that date. Tr. 90, 110. Maellaro has been diagnosed with several impairments, including "residuals from a compound fracture of the right leg at age nine, status open reduction and internal fixation with ongoing right ankle pain," degenerative disc disease of the lumbar spine, seasonal allergic rhinitis, suspected reflex sympathetic dystrophy of the right leg, and dyslexia. Tr. 282. On September 12, 2007, Maellaro's applications were initially denied by the Bureau of Disability Determination. Tr. 76, 80.

A hearing was conducted by an administrative law judge ("ALJ") on June 2, 2011, where Maellaro was represented by counsel. Tr. 304-62.[1]  On July 6, 2011, the ALJ issued a decision denying Maellaro's application. Tr. 279-89. On July 11, 2012, the Appeals Council declined to grant review. Tr. 258. Maellaro filed a complaint before this

---

[1] This was the second administrative hearing held in this case. The first hearing was held on December 2, 2008, resulting in a denial of Maellaro's application. Tr. 12, 38. Thereafter, Maellaro filed suit in federal court; by order dated November 4, 2010, the case was remanded to the Commissioner for further proceedings. Tr. 378.

Court on August 14, 2012. Supporting and opposing briefs were submitted and this case became ripe for disposition on April 4, 2013, when Maellaro filed a reply brief.

Maellaro appeals the ALJ's determination on three grounds: (1) the ALJ committed legal error in the analysis of whether a listing was met at step three, (2) the ALJ erroneously rejected the opinions of Maellaro's treating physicians, and (3) the ALJ improperly found that Maellaro's testimony and a third-party's statement were less than credible. For the reasons set forth below, this case is remanded to the Commissioner for further proceedings.

## Statement of Relevant Facts

Maellaro is 48 years of age, has a high school degree, and is able to read, write, and understand the English language. Tr. 44, 90, 322. Maellaro had past relevant work as a maintenance worker/supervisor, which is classified as medium, skilled work, and as a grounds maintenance worker, which is medium, semi-skilled work. Tr. 350.

### A. Medical Evidence

When Maellaro was nine years old, he was involved in a motorcycle accident and sustained a compound fracture to his right leg. Tr. 176. Maellaro reported that, at the time of the accident, at least one doctor recommended amputating the injured leg, although this did not happen. Tr. 48, 437, 464. Maellaro healed from these injuries, although there is some suggestion that "he was not followed through properly by a physician . . ." Tr. 256.

In August, 2007, Thomas Dittman, M.D. examined Maellaro and completed a residual functional capacity assessment. Tr. 176-184. At this examination, Maellaro arrived

3

using a cane for ambulation and complained of right leg, foot, and ankle pain and numbness. Tr. 176-77. Maellaro reported that the symptoms had grown worse over the years; these symptoms occurred sporadically, but typically occurred several times each day. Tr. 176. Maellaro reported that the pain grew worse with walking, exertion, or the application of weight to his legs or feet. *Id.* Maellaro also reported continuous pain in his lower back that radiated to his right hip and thigh. *Id.*

Dr. Dittman noted that Maellaro's straight leg raising test was negative bilaterally in the sitting position. Tr. 178. However, in the supine position the straight leg test was positive for pain at sixty degrees of elevation for the right leg; the left leg was negative to eighty degrees. *Id.* Dr. Dittman also observed evidence of a decreased range of motion in the right ankle. *Id.* Dr. Dittman noted extensive scarring on Maellaro's right leg around the ankle and lower calf; the right leg was also smaller in diameter than the left leg. *Id.* Maellaro's strength was 5/5 throughout his extremities, except for the right foot dorsiflexion, which was 4/5. *Id.* Dr. Dittman noted that Maellaro's gait was antalgic.[2] *Id.* An x-ray of Maellaro's lumbar spine revealed disc space narrowing at the L5-S1 level, mild narrowing at the L1-L2 level, and anterior marginal osteophyte[3] formations. *Id.*

---

[2] An antalgic gait is one that an individual has developed to "prevent or alleviate pain." Oxford English Dictionary Online, http://www.oed.com/view/Entry/8183?redirectedFrom=antalgic#eid (last visited June 10, 2014).

[3] Osteophytes, also referred to as bone spurs, are "bony projections that develop along the edges of bones." Mayoclinic.com, Bone Spurs Definition, *available at* http://www.mayoclinic.org/diseases-conditions/bone-spurs/basics/definition/con-20024478 (last visited June 10, 2014).

Dr. Dittman opined that Maellaro was capable of frequently lifting up to twenty-five pounds and was capable of carrying up to twenty-five pound occasionally, but only ten pounds frequently. Tr. 183. Dr. Dittman also believed that Maellaro could only stand or walk for one hour or less in an eight-hour workday. *Id.* Dr. Dittman further opined that Maellaro could never balance or climb, and could only occasionally bend, kneel, stoop, or crouch. Tr. 184. Otherwise, Dr. Dittman did not believe Maellaro was limited in any way. Tr. 183-84.

On November 26, 2007, Michael Dawson, M.D. examined Maellaro. Tr. 222-23. Maellaro complained of right hip pain and locking of the right knee. Tr. 222. Although Maellaro was able to stand straight, he had a "right stiff legged gait," and a positive Trendelenburg sign[4] for the left hip. *Id.* Dr. Dawson noted atrophy and scarring on Maellaro's right leg, although circulation was normal to both feet. *Id.* Tests revealed a decreased range of motion in Maellaro's lumbar spine, a twenty-five percent decreased range of motion in the subtalar joint and midtarsal joints in the right foot, as well as slight weakness of the right foot plantar flexion. *Id.* EMG and nerve conduction studies of Maellaro's right leg were "normal." Tr. 223.

Dr. Dawson concluded that Maellaro was "significantly disabled as a result of multiple injuries sustained some 30 years ago." *Id.* Dr. Dawson stated that Maellaro's atrophied right leg, weak left hip, as well as the limited range of motion in Maellaro's lumbar

---

[4] A positive Trendelenburg sign occurs if, when an individual is standing on one leg, the pelvis drops on the side opposite of that leg, instead of rising. *Dorland's Illustrated Medical Dictionary*, 30th Ed. (2003) at 1884. This leads to difficulty maintaining balance, which leads to instability. *Id.*

5

spine and right foot contributed to this conclusion. *Id.* This led Dr. Dawson to opine that

Maellaro could not walk or "stand for any length of time . . ." *Id.* Furthermore, Dr. Dawson

believed that Maellaro could not climb ladder or inclines, and could not "walk on uneven

ground." *Id.* Finally, Dr. Dawson opined that Maellaro could only occasionally bend, crawl,

crouch, kneel, or stoop. *Id.*

Beginning in January 2008 and continuing through February 2011, Maellaro

presented to Gursharan Singh, M.D. for appointments primarily relating to Maellaro's

chronic back pain. Tr. 215-19, 473-87.[5] On November 4, 2008, Dr. Singh noted that

Maellaro was increasingly losing his balance and falling; on January 8, 2009, Dr. Singh

noted that Maellaro was having increased difficulty ambulating. Tr. 215, 486. On

November 17, 2009, Dr. Singh noticed increased ankle swelling. Tr. 481. Otherwise, Dr.

Singh's notes were sparse, but consistently noted significant back pain; Dr. Singh also

consistently prescribed Vicodin to ease Maellaro's pain. Tr. 215-19, 473-87.

On November 25, 2008, Dr. Singh completed a physical residual functional capacity

assessment of Maellaro. Tr. 211-13. Dr. Singh opined that Maellaro was limited to lifting

less than ten pounds, and could stand or walk for fewer than two hours in an eight-hour

workday; Maellaro also "must alternate sitting and standing" in ten to twenty minute

---

[5] These appointments occurred on: January 15, 2008, March 18, 2008, April 22, 2008, June 24, 2008, August 25, 2009, November 4, 2008, December 9, 2009, January 8, 2009, February 10, 2009, March 11, 2009, April 14, 2009, May 14, 2009, June 16, 2009, July 15, 2009, June 16, 2009, July 15, 2009, August 13, 2009, September 15, 2009, October 15, 2009, November 17, 2009, December 16, 2009, January 19, 2010, February 18, 2010, March 18, 2010, April 20, 2010, May 19, 2010, June 22, 2010, July 22, 2010, August 23, 2010, September 22, 2010, October 19, 2010, November 18, 2010, December 21, 2010, January 21, 2011, and February 23, 2011.

6

intervals. Tr. 211. Dr. Singh believed that Maellaro was limited in his ability to push and/or pull with either his upper or lower extremities. *Id.* Dr. Singh further opined that Maellaro could frequently use ramps and climb stairs, occasionally climb ladders, ropes, and scaffolds, could occasionally balance and stoop, but could never kneel, crouch, or crawl. Tr. 212. Dr. Singh based these opinions on Maellaro's ligament and tendon damage in his right leg, his right hip pain, poor circulation, numbness, lower back pain, and difficulty ambulating which led to Maellaro losing balance and falling. Tr. 211.

Dr. Singh believed that Maellaro was limited in reaching all directions, in his gross manipulation abilities, his fine manipulation abilities, and his feeling (skin receptors) abilities. Tr. 212. According to Dr. Singh, these limitations were caused by Maellaro's chronic back pain. *Id.* Finally, Dr. Singh opined that Maellaro must avoid all exposure to extreme heat and cold, wetness, humidity, vibration, airborne irritants, and hazards; he should also avoid even moderate exposure to noise. Tr. 213. Dr. Singh stated that these environmental factors would be "detrimental" to Maellaro because exposure would increase Maellaro's pain and he did "not have the ability to move quickly should the need arise to evacuate to safety in a serious situation." *Id.*

In a follow-up letter dated February 2, 2009, Dr. Singh mostly reiterated these beliefs. Tr. 256-57. Dr. Singh noted that Maellaro had sustained a "traumatic injury" to his right leg as a child, and, though the injury healed, "he was not followed through properly by a physician . . ." Tr. 256. As a result, Maellaro was now complaining of severe low back,

7

right hip, right knee, and leg pain. *Id.* Dr. Singh noted that Maellaro's ability to ambulate was "becoming increasingly more dysfunctional accompanied by random flare-ups of pain, stiffness and numbness." *Id.* Dr. Singh stated that, after consulting with Dr. Dawson, both doctors concurred that Maellaro's condition would not improve. Tr. 257. Dr. Singh opined that, because Maellaro's pain occurred regularly throughout the day, he would frequently be absent or unable to complete full workdays. *Id.* Consequently, Dr. Singh believed that Maellaro was not able to sustain gainful employment of any sort. *Id.*

On April 4, 2009, Maellaro presented to John Chawluk, M.D., a neurological specialist. Tr. 464-65. Maellaro complained of back pain, leg pain, and chronic bilateral leg paresthesias;[6] he explained that his symptoms worsened with prolonged sitting. Tr. 464. At this appointment, Colby Powell, Dr. Chawluk's certified physician assistant, noted diminished reflexes Maellaro's right Achilles, as well as weakness in the right hip flexion, the bilateral dorsiflexion, and the bilateral extensor halluces longus. *Id.* Mr. Powell also observed that pin sensation was diminished in Maellaro's right foot and, although Maellaro was able to perform heel to toe walking, his gait was antalgic. Tr. 465. An EMG and nerve conduction study of the lower extremities was ordered, as was a lumbar MRI scan. *Id.*

On May 15, 2009, Maellaro returned to Dr. Chawluk for a follow-up appointment. Tr. 463. Dr. Chawluk reviewed the lumbar MRI scans and found only mild abnormalities. *Id.*

---

[6] Paresthesia is a sensation of tingling, prickling, or numbness of the skin, more generally known as the feeling of pins and needles. *Dorland's Illustrated Medical Dictionary*, 1232 (27th Ed.1988).

The MRI and nerve conduction tests revealed possible mild right tibial neuropathy[7] at the

ankle. *Id.* Dr. Chawluk suspected that Maellaro suffered from chronic reflex sympathetic

dystrophy,[8] and prescribed Neurontin in an attempt to alleviate Maellaro's symptoms. *Id.*

On February 3, 2011, Maellaro returned to Dr. Dawson for an appointment. Tr. 492.

Dr. Dawson noted right ankle issues, although there was no other joint swelling at that time.

*Id.* Dr. Dawson ordered x-rays of Maellaro's lumbar spine and right ankle. *Id.* On March

21, 2011, Maellaro returned to Dr. Dawson for a follow-up appointment. Tr. 491. Dr.

Dawson noted that Maellaro's right ankle remained painful and swollen. *Id.* On March 2,

2011, x-rays were taken of Maellaro's lumbar spine; these x-rays demonstrated a

progressive worsening of Maellaro's spinal condition. Tr. 495. The x-rays showed that

Maellaro suffered from "moderate to severe" degenerative disc disease at the L5-S1 level.

*Id.* Dr. Dawson reviewed the x-rays of Maellaro's lumbar spine, and diagnosed Maellaro

with moderate spondylosis[9] narrowing at the L5-S1 vertebrae. [10]  *Id.* On May 13, 2011, in

---

[7] Tibial neuropathy occurs when there is damage to the tibial nerve. Possible symptoms include a burning sensation, numbness, tingling, or pain in the foot, or weakness of the foot muscles, toes, or ankle. National Institute of Health, Tibial nerve dysfunction, *available at* http://www.nlm.nih.gov/medlineplus/ency/article/000792.htm (last visited June 11, 2014).

[8] Reflex sympathetic dystrophy, more commonly known as complex regional pain syndrome ("CRPS"), "is a chronic pain condition. The key symptom of CRPS is continuous, intense pain out of proportion to the severity of the injury, which gets worse rather than better over time." National Institute of Neurological Disorders and Stroke, Complex Regional Pain Syndrome Information Page, *available at* http://www.ninds.nih.gov/disorders/reflex_sympathetic_dystrophy/reflex_sympathetic_dystrophy.htm (last visited June 11, 2014). There is no cure for CRPS. *Id.*

[9] Spondylosis "is a degenerative disorder that may cause loss of normal spinal structure and function. . . Sitting for prolonged periods of time may cause pain and other symptoms due to pressure on the lumbar vertebrae. Repetitive movements such as lifting and bending (eg, manual labor) may increase pain." SpineUniverse.com, Spondylosis, *available at* http://www.spineuniverse.com/conditions/spondylosis/spondylosis (last visited June 11, 2014).

answer to an interrogatory sent by Maellaro's attorney, Dr. Dawson stated that the opinion

he had provided in his February 28, 2008 letter had not changed.  Tr. 497.

## B.    Third Party Statement

Prior to the first administrative hearing, Maellaro's wife, Heather Maellaro,

completed a third party statement.  Tr. 139-46.  Ms. Maellaro detailed limited activities of

daily living; she wrote that Maellaro generally spent his days in the house watching

television or speaking with her.  Tr. 139.  Ms. Maellaro also stated that Maellaro had

difficulties sleeping due to back and leg pain.  Tr. 140.  She further stated that Maellaro

previously cooked meals, but was no longer able to cook because standing for too long

bothered his back and legs.  Tr. 141.  She also wrote that Maellaro could cut the lawn with a

riding lawn mower, although it took him "about 3 days" to complete the task.  Id.  Maellaro

went grocery shopping with Ms. Maellaro approximately once per month.  Id.

Ms. Maellaro reiterated later in the statement that Maellaro "mostly watches TV," but

needed to get up and move around due to leg and back pain.  Tr. 143.  While Maellaro did

spend time with others, this mostly occurred at his home.  Id.  Ms. Maellaro stated that

Maellaro had difficulty lifting, squatting, bending, standing, reaching, walking, sitting,

kneeling, climbing stairs, completing tasks, and getting along with others.  Tr. 144.

Specifically, Ms. Maellaro stated that Maellaro could not lift much weight, and his knees

were "bad" enough that, if he had to bend or "be on" his knees for a while, his knees and

---

[10] Maellaro also had appointments with Dr. Dawson on February 3, 2011 and April 13, 2011.  Tr. 491-92.

back would hurt; for this reason, Maellaro was also generally unable to complete tasks. *Id.*

Ms. Maellaro stated that Maellaro could not walk very far, and did not follow written

instructions very well. *Id.* Maellaro also could not handle stress or changes in routine well.

Tr. 145. Ms. Maellaro stated that Maellaro was depressed by his inability to work, and

sometimes felt useless. Tr. 146.

### C. The Administrative Hearings

On December 2, 2008, Maellaro's first administrative hearing was conducted. Tr.

38-72. Maellaro testified that he was then living with his wife and fourteen-month old son.

Tr. 45. Maellaro testified that most of his physical issues stemmed from a motorcycle

accident that had occurred when he was nine years old. Tr. 48. Maellaro testified that the

injury was so severe that one doctor recommended amputating the leg. *Id.* Maellaro stated

that he had pain in his leg, knees, and back, as well as tingling in his hands and "good" leg;

these symptoms were exacerbated by humidity. Tr. 48-49.

Maellaro testified that, since he had trouble with stairs and his bedroom was on the

second floor, he would generally go downstairs in the morning and stay there until it was

time to sleep. Tr. 49. During the day, Maellaro would alternate between sitting in a chair,

sitting in a recliner, and lying down; he testified that he often had to elevate his leg because

it "throbs so much." *Id.* Maellaro stated that his symptoms had grown worse over the years.

Tr. 50. Maellaro further testified that, due to his spinal issues, it sometimes took him forty-

five minutes to get out of bed in the morning, and his legs were a "full shoe difference . . . in

11

height" due to hip and spinal alignment issues. Tr. 50-51. Maellaro testified that he could

not bend his knees and, consequently, it took him thirty to forty minutes to tie his shoes. Tr.

53. Due to weak muscles in his ankle, Maellaro would sometimes trip on his own feet. *Id.*

When the weather was bad, Maellaro required the use of a cane to walk. Tr. 59.

For activities of daily living, Maellaro was able to drive short distances and go

grocery shopping approximately one time per month, but was unable to cook anything other

than a microwavable meal due to his pain. Tr. 53-55. Maellaro also testified that he could

only occasionally lift his son, who weighed approximately thirty pounds. Tr. 56-57. Maellaro

stated that he was able to "cut the grass at short intervals" with the use of his tractor. Tr.

58. Once in a while, Maellaro was able to go for a short walk in his back yard. Tr. 61.

Maellaro offered additional testimony during the second administrative hearing on

June 2, 2011; Maellaro arrived to this hearing using a cane. Tr. 304-62. At the hearing,

Maellaro testified that, in addition to his then four-year old son, he also had a nearly two-

year old daughter. Tr. 315. Maellaro stated that his wife cared for the two children,

although when she had been previously employed, Maellaro cared for the children and had

to carry them "from time-to-time." Tr. 316. During that period of time, his daughter was

"light" so he was able to pick her up. Tr. 338. However, at the time of the hearing, Maellaro

was not able to bend and had difficulty picking up his daughter, such that she needed to

climb up a chair and onto a table so that Maellaro could change her diaper. *Id.* Maellaro

iterated that he drove short distances, but was afraid to drive for any extended length of

12

time due to ankle issues and drowsiness from his medication. Tr. 319. Maellaro testified that his only real hobby was watching television, although he occasionally read a "motors manual" or newspaper. Tr. 320, 323. Maellaro also testified that he had difficulty sleeping due to pain. Tr. 340.

Maellaro testified that he had stopped working in 2006 due to financial issues with his bar, and because he found it was too difficult and "overwhelming" trying to perform all of the tasks that were required. Tr. 324. Maellaro also stated that cold weather and humidity "bothered" him. Tr. 326. If he stood for too long, Maellaro's ankle would swell to "three times" its normal size. *Id.* During the hearing, the ALJ examined Maellaro's ankle, and noted that swelling and atrophy were present. Tr. 328-29. In her opinion, the ALJ described the swelling as "mild to moderate." Tr. 287. Maellaro testified that he was in a "constant battle with the pain," and he was in "more pain every day now than I've ever been in my life." Tr. 331. On examination by his attorney, Maellaro stated that he had difficulty walking on uneven ground. Tr. 347. Maellaro testified that on uneven ground, his ankle or knee would give out and he would fall, or he would simply trip. *Id.* Maellaro stated that his knee would give out and he would fall down "[a]t least five times to ten times a month." Tr. 347-48.

After Maellaro testified, Frances Terry, an impartial vocational expert, was called to give testimony. Tr. 349. The ALJ asked the vocational expert to assume a hypothetical individual with Maellaro's age, education, and work experience that was limited to sedentary

work and must be afforded the option to sit or stand at will. Tr. 351. Furthermore, the
hypothetical individual could only occasionally balance, stoop, kneel, crouch, and climb
stairs or ramps, but could never crawl or climb ladders, ropes, or scaffolds. *Id.* This
individual must avoid occupations that require pushing or pulling with the lower extremities,
and must avoid concentrated, prolonged exposure to airborne irritants, temperature
extremes, or extreme dampness or humidity. Tr. 351-52. The hypothetical individual was
also limited to occupations that did not require exposure to hazards, and that could be
performed with the use of a cane. Tr. 352. Finally, this hypothetical individual was limited
to simple, routine tasks not performed in a fast-paced production environment, and could
only make simple work-related decisions with relatively few workplace changes. *Id.*

The vocational expert opined that this hypothetical individual would be unable to
perform any of Maellaro's past relevant employment. *Id.* However, the vocational expert
testified that this individual would be capable of performing three other jobs that exist in
significant numbers in the regional economy: a surveillance system monitor, a charge
account clerk, and a telephone receptionist. *Id.*

## Discussion

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision
denying a plaintiff's claim for disability benefits, the district court must uphold the findings of
the Commissioner so long as those findings are supported by substantial evidence.
Substantial evidence "does not mean a large or considerable amount of evidence, but

'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. *See* 20 C.F.R. § 404.1520; *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. *See* 20 C.F.R. § 404.1520. The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason*, 994 F.2d at 1064.

## A.    The ALJ's Findings at Step Three

In support of his argument that the ALJ erred at step three of the sequential evaluation process, Maellaro contends that the ALJ did not provide sufficient reasoning for her conclusion that Maellaro did not meet or equal a listing. Specifically, Maellaro argues that he met listing 1.02.[11]

---

[11] This listing, major dysfunction of a joint(s), is met when the joint is "[c]haracterized by gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With . . . [i]nvolvement of one major

16

To be considered disabled at step three of the sequential evaluation process, an impairment or combination of impairments must meet or medically equal an impairment listed in the Social Security Administration's Regulations. *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992). "'For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'" *Id.*, *quoting Sullivan v. Zebley*, 493 U.S. 521, 529–30 (1990) (emphasis in original). The ALJ must "fully develop the record and explain his findings at step three." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 126 (3d Cir. 2000). In so doing, the ALJ must "specify those listings that potentially apply to the claimant's impairments and give reasons why those listings are not met or equaled." *Roberts v. Astrue*, 02:08-CV-0625, 2009 WL 3183084, at *6 (W.D. Pa. Sept. 30, 2009), *citing Burnett*, 220 F.3d at 119–20 n. 2. The Third Circuit had repeatedly stated that "it is the ALJ's 'responsibility . . . to identify the relevant listed impairment(s)' and 'develop the arguments both for and against granting benefits.'" *Torres v. Comm'r of Soc. Sec.*, 279 F. App'x 149, 152 (3d Cir. 2008), *quoting Burnett*, 220 F.3d at 119–20 n. 2.

Here, the ALJ concluded at step two that Maellaro suffered from several severe impairments, including "residuals from a compound fracture of the right leg at age nine, status open reduction and internal fixation with ongoing right ankle pain," degenerative disc

---

peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively . . ." 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 1.02A. The Social Security Regulations provide specific examples of the inability to effectively ambulate, including "the inability to walk a block at a reasonable pace on rough or uneven surfaces." *Id.* at Section 1.00B(2)(b)(2).

disease of the lumbar spine, seasonal allergic rhinitis, and suspected reflex sympathetic

dystrophy of the right leg. Tr. 282. Thereafter, the ALJ made the following determination at

step three:

> The claimant's representative argued, inter alia, that the claimant's conditions
> meet listing 1.02. Although the undersigned finds that the claimant is afflicted
> with severe impairments, the salient facts and competent evidence in this
> case reveal that the claimant does not have an impairment, or combination of
> impairments, severe enough to meet or equal the requirements of any of the
> listed impairments. In order to make this determination, the undersigned has
> reviewed and examined the requirements of the listings including, but not
> limited to sections 1.00, et seq., 3.00, et seq. and 11.00, et seq., as well as
> the medical evidence, and the undersigned has concluded that the claimant is
> not presumptively disabled pursuant to 20 CFR 404.1520(d) or 20 CFR
> 415.920(d) because the evidence of record does not document the specific
> findings for listing severity.

Tr. 283. The ALJ's finding at step three is flawed in two ways.

First, although the ALJ did specifically reference listing 1.02, and it can be assumed

that the ALJ did in fact consider listing 1.02, the ALJ did not provide any reasoning for

finding that Maellaro did not meet this listing. The ALJ concluded that Maellaro did not meet

that listing without citing to any supporting explanation for how Maellaro's joint issues fail to

qualify. This is insufficient. *See, Burnett*, 220 F.3d at 119; *see also, Torres*, 279 F. App'x at

152 ("There is no way to review the ALJ's decision in this case because no reasons were

given for [the ALJ's] conclusion that [the claimant's] impairments in combination did not

meet or equal an Appendix 1 listing.").

Second, the ALJ also failed to explain how the combination of Maellaro's severe

impairments failed to meet or equal a listing. The ALJ stated that Maellaro "does not have

an impairment, or combination of impairments, severe enough to meet or equal the

requirements of any of the listed impairments." Tr. 283. However, without further

explanation or evidence supporting such a conclusion, judicial review of this determination

is not possible. *Burnett*, 220 F.3d at 119; *Torres*, 279 F. App'x at 152.

The Commissioner cites to *Jones v. Barnhart*, 364 F.3d 501 (3d Cir. 2004), and

argues that remand is not needed because the ALJ here sufficiently developed the record.

In *Jones*, the plaintiff alleged error at step three where the ALJ failed to find the plaintiff

disabled under the listings. *Id.* at 503. However, the Third Circuit noted that the ALJ did

cite to relevant evidence, including references to specific medical tests. *Id.* at 505. Despite

tests that supported the plaintiff's claim, the ALJ focused on other substantial evidence that

undermined a finding that the plaintiff met a listing. *Id.* Consequently, the Third Circuit

concluded that "the ALJ's decision, read as a whole, illustrates the ALJ considered the

appropriate factors in reaching [a] conclusion . . ." *Id.*

Unlike *Jones*, here the ALJ never explicitly rejected evidence establishing the

existence of an impairment that met or equaled a listing, such as Dr. Dawson's conclusion

that Maellaro could not walk on uneven ground. Tr. 285-87. [12] More importantly, the ALJ

never pointed to any evidence that would refute the conclusions and observations of

Maellaro's treating physicians. Without an adequate discussion of this relevant and

probative evidence, or discussion of why the evidence may have been rejected, the ALJ's

---

[12] Even if the ALJ's language can be interpreted as rejecting the entirety of Dr. Dawson's opinion,
tr. 287, as discussed below in subsection B, such a determination would have been improper.

decision cannot be meaningfully reviewed. Therefore the ALJ's decision at step three cannot be said to be supported by substantial evidence.

## B.    Treating Physician Opinions

Maellaro next argues that the ALJ improperly rejected the opinions of two treating physicians, Drs. Singh and Dawson. Specifically, Maellaro argues that the ALJ's evaluation violates the United States Court of Appeals for the Third Circuit's preference for treating physician opinions.

### i.    Preference for Treating Physician Opinions

The preference for the treating physician's opinion has been recognized by the Third Circuit and by all of the federal circuits. *See, e.g., Morales v. Apfel*, 225 F.3d 310, 316-18 (3d Cir. 2000). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." *Id*. In choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. *Id*.

The ALJ gave little weight to any portion of Dr. Singh's residual functional capacity assessment that conflicted with the ALJ's residual functional capacity determination. Tr. 286. The ALJ rejected several specific conclusions, including Dr. Singh's opinion that Maellaro could only stand or walk for fewer than two hours in an eight hour workday. *Id*.

The ALJ gave these opinions little weight because, in the ALJ's view, "they are not consistent with or supported by the other medical evidence of record." *Id.*

The ALJ's limited discussion does not permit adequate review of her findings. Such a conclusory statement may have sufficed had the ALJ discussed all of the relevant evidence. However, the ALJ omitted discussion of relevant evidence; for example, the ALJ did not discuss, or even reference, any of Dr. Dawson's notes, opinions, or findings after the year 2007. Tr. 488-93. Such relevant evidence may well have supported Dr. Singh's conclusions, and certainly were not inconsistent with his findings. Without discussion of this evidence, it cannot be determined "if significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).[13] Consequently, the ALJ improperly rejected Dr. Singh's opinion.

The ALJ also stated that "Dr. Dawson's opinion is given little weight." Tr. 287. The ALJ went on to explain that Dr. Dawson's "determination that the claimant is disabled is an issue that is reserved to the Commissioner . . . [and] it is not supported by the objective evidence or his own clinical findings." *Id.* From the language employed by the ALJ, it is unclear whether the ALJ gave limited weight to Dr. Dawson's opinion as a whole, or simply to that portion addressing Maellaro's ultimate disability. However, even assuming the ALJ rejected the entirety of Dr. Dawson's opinion, the ALJ only provided reasons for rejecting Dr. Dawson's opinion that Maellaro was disabled. *Id.* Consequently, the ALJ provided no

---

[13] For the same reasons, the ALJ's decision to give limited weight to portions of Dr. Singh's February 2009 letter is also flawed.

reason for discrediting Dr. Dawson's other opinions, such as his opinion that Maellaro

"cannot stand [or walk] for any length of time" and could not "walk on uneven ground . . ."

Tr. 223.  The ALJ thus erred in rejecting Dr. Dawson's opinions without providing any

reason at all for that rejection. *Morales*, 225 F.3d at 317.

ii.     Absence of Any Medical Opinion to Support the ALJ's Ultimate Determination

The ALJ's decision to reject the opinions of Maellaro's treating physicians created a

further issue; the ALJ was forced to reach a residual functional capacity determination

without the benefit of any medical opinion.  Rarely can a decision be made regarding a

claimant's residual functional capacity without an assessment from a physician regarding

the functional abilities of the claimant. *See Doak v. Heckler*, 790 F.2d 26, 29 (3d

Cir.1986)("No physician suggested that the activity [the claimant] could perform was

consistent with the definition of light work set forth in the regulations, and therefore the

ALJ's conclusion that he could is not supported by substantial evidence."). *See also*, *Arnold

v. Colvin*, 3:12-CV-02417, 2014 WL 940205, at *4 (M.D. Pa. Mar. 11, 2014); *Gormont v.

Astrue*, 3:11-CV-02145, 2013 WL 791455, at *7 (M.D. Pa. Mar. 4, 2013); *Troshak v. Astrue*,

4:11-CV-00872, 2012 WL 4472024, at *7 (M.D. Pa. Sept. 26, 2012).

The ALJ's decision to discredit, at least partially, every residual functional capacity

assessment proffered by medical experts left her without a single medical opinion to rely

upon.  For example, three physicians opined that Maellaro was limited in some way in his

ability to stand and/or walk: Dr. Dittman opined that Maellaro could stand/walk for less than

22

one hour, Dr. Singh believed that Maellaro could stand/walk for fewer than two hours, and

Dr. Dawson opined that Maellaro could not stand or walk for any length of time. Tr. 183,

211, 223. In rejecting these three opinions, there were no other medical opinions upon

which the ALJ could base her decision that Maellaro essentially had no limitations in his

ability to stand or walk.[14] Tr. 283. Consequently, the ALJ's decision to reject the opinions of

Drs. Singh and Dawson, and the ALJ's determination of Maellaro's residual functional

capacity, cannot be said to be supported by substantial evidence.

### C.    Absence of Evidentiary Support for the ALJ's Credibility Determination

Finally, Maellaro challenges the ALJ's credibility determinations in this case.

Maellaro argues that the ALJ improperly rejected Maellaro's credibility, and improperly

found Maellaro's wife to be less than credible in relation to the third party statement she had

submitted. An ALJ's credibility determination is entitled to deference by the district court

because "he or she has the opportunity at a hearing to assess a witness's demeanor."

*Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003). Credibility determinations are only

---

[14] As two commentators have explained: "Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination based on those administrative definitions and is reserved to the Commissioner. However, the underlying determination is a medical determination, i.e., that the claimant can lift five, 20, 50, or 100 pounds, and can stand for 30 minutes, two hours, six hours, or eight hours. That determination must be made by a doctor. Once the doctor has determined how long the claimant can sit, stand or walk, and how much weight the claimant can lift and carry, then the ALJ, with the aid of a vocational expert if necessary, can translate that medical determination into a residual functional capacity determination . . . Thus, while agency regulations provide the ultimate issues such as disability and RFC are reserved to the agency, it may not reject a physician's medical findings that determine the various components and requirements of RFC." Carolyn A. Kubitschek & Jon C. Dubin, *Social Security Disability Law and Procedure in Federal Courts*, 344–345 (2014).

accorded such deference when there is a "sufficient basis" for that determination. *Izzo v. Comm'r of Soc. Sec.,* 186 F. App'x 280, 286 (3d Cir. 2006), *citing Schaudeck v. Comm'r of Soc. Sec.,* 181 F.3d 429, 433 (3d Cir. 1999).

Despite the deference that is properly due to the ALJ in credibility determinations, the ALJ improperly discounted Heather Maellaro's third party statement. The ALJ gave two reasons for affording Ms. Maellaro's third party statement little weight: Ms. Maellaro was "not a medical professional," and "she has obvious motivation to support her husband's claim for benefits." Tr. 287. Neither reason constituted a sufficient basis for discrediting Ms. Maellaro's third party statement.

The Commissioner encourages claimants to submit third party statements, and recognizes the relevance of statements from individuals who know the claimant. *See* 20 C.F.R. §§ 416.912, 416.913 and 416.929; SSR 96–7p and 96–8p. Third party statements can support a claimant's credibility, and help evaluate the claimant's impairments, symptoms, limitations, functioning, and activities of daily living. *Id.*; *see also, Burnett,* 220 F.3d at 122.

The ALJ may not reject a third party statement by virtue of the fact that the third party is not a medical professional. Third party statements, by their very nature, are submitted by those who know the claimant and are close to the claimant. Rarely, if ever, will these statements be submitted by a medical professional. Similarly, every third party statement is submitted by individuals who know the claimant, and are often submitted by those who are

closest to the claimant. *See*, 20 C.F.R. § 416.913 (other sources include "spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy."). If an ALJ could reject third part statements merely because that individual has some motivation to support the claimant's case, it would defeat the entire purpose of submitting third party statements and would run contrary to the Commissioner's express rulings. *See*, SSR 96–7p ("the adjudicator must consider the entire case record, including . . . information provided by . . . other persons.").

If an ALJ could reject third party statements as inherently unreliable for the reasons given, there would be no reason for a claimant to submit such statements. An ALJ could reject third party statements in every case by merely inserting boiler-plate language similar to the language used by the ALJ in this case. While the ALJ's credibility determinations are ordinarily accorded deference, here the ALJ's determination lacked evidentiary support and was contrary to the Commissioner's regulations. Additionally, since this was a third party statement, Ms. Maellaro did not actually testify before the ALJ and there was no means by which the ALJ could judge her credibility. Consequently, the ALJ's credibility determination of Ms. Maellaro was not supported by substantial evidence.[15]

Finally, it should be noted that this will be the second remand order by a federal court for this case. Maellaro has now waited more than seven years for his claim to be

---

[15] Despite the deference that is due to the ALJ's credibility determinations, the ALJ's evaluation of Maellaro's credibility was compromised due to the error in evaluating Ms. Maellaro's third party statement. *See*, *Burnett*, 220 F.3d at 122 ("the ALJ made a credibility determination regarding [the claimant], and these witnesses were there to bolster her credibility."). Therefore, on remand the ALJ should also re-evaluate Maellaro's credibility, accounting for any weight given to Ms. Maellaro's third party statement.

processed. Unfortunately, this Court is unable to reach a final resolution in this matter, and an award of benefits is not proper at this time. Given the duration of this process, on remand the Commissioner should promptly reach a determination in accordance with this Opinion.

## Conclusion

A review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order will be entered.

BY THE COURT:

Robert D. Mariani
United States District Judge

Dated: June /8 , 2014